1
2
3
4
5
6
7
8               **UNITED STATES DISTRICT COURT**

9               **EASTERN DISTRICT OF CALIFORNIA**

10

11  RODESKI MONTREAZ EDWARDS,          )   Case No.: 1:11-cv-00689-JLT
                                       )
12                  Petitioner,        )   FINDINGS AND RECOMMENDATIONS TO
                                       )   DENY PETITION FOR WRIT OF HABEAS
13          v.                         )   CORPUS (Doc. 1)
                                       )
14  URIVE DOMINGO, JR., Warden,        )   ORDER DIRECTING THAT OBJECTIONS BE
                                       )   FILED WITHIN TWENTY-ONE DAYS
15                  Respondent.        )
                                       )
16  ─────────────────────────────────

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18  pursuant to 28 U.S.C. § 2254.

19                          **PROCEDURAL HISTORY**

20          Petitioner is in custody of the California Department of Corrections and Rehabilitation serving

21  an indeterminate sentence of 43 years-to-life pursuant to a July 22, 2008 judgment of the Superior

22  Court of California, County of Fresno (the "Superior Court"), as a result of a conviction for second

23  degree murder (Cal. Pen. Code § 187(a)); being a felon in possession of a firearm (Cal. Pen. Code §

24  12021(a)(1); and three prior strikes (Cal. Pen. Code § 667.5).  (Lodged Document ("LD") 4, pp. 1-2).

25          Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth Appellate

26  District (the "5th DCA").  (LD 1; 2; 3).  In an unpublished decision, the 5th DCA affirmed Petitioner's

27  conviction.  (LD 4).   Thereafter, Petitioner filed a petition for review in the California Supreme Court,

28

                                        1

which was denied on April 14, 2010.  (LD 5; 6).  Respondent concedes that the all grounds for relief in the petition have been fully exhausted.  (Doc. 10, p. 5).

## FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

Westfield lived with his sister, Kathleen Westfield (Kathleen), at her home on West Eden Avenue in Fresno. Westfield also spent time with his girlfriend, Ebony Washington, at a house in the same neighborhood, on West Strother. Westfield regularly traveled around the neighborhood on foot and on a bicycle. He was also known as "Khaliyl Illallahi" and "Joker."

Defendant lived in the same neighborhood as Westfield, and he was known to Westfield and others as "Buck Naked" and "Boo."

The incident at Wayne's Liquor Store

On or about Sunday, November 18, 2007, a few days before Westfield was killed, an incident occurred between Westfield and defendant at Wayne's Liquor Store, located in the neighborhood where they both lived. Carol Jean Byers, a county probation officer, knew both men and she was at the liquor store when the incident occurred. Byers testified Westfield was sitting outside the store on his bicycle when she went into the store. When Byers walked out, she saw Westfield and defendant fighting in the middle of the street. Defendant was throwing punches and advancing toward Westfield. Westfield tried to block the blows and moved backwards to get away from defendant.

Byers testified Westfield's bicycle was on the curb, and defendant picked it up and threw it at Westfield. Westfield and defendant struggled over the bicycle. Westfield regained control of the bicycle, walked away from the store, and sat on the bicycle. Byers testified Westfield was holding a paper sack which appeared to contain a beverage can. Westfield threw the bag at defendant and missed. Defendant grabbed the bicycle and again threw it at Westfield. Byers testified Westfield never threw the bicycle at defendant.

Byers testified that defendant walked back to the liquor store and appeared angry.  Defendant said to Westfield: "'... [Y]ou don't know. I hurt you. I kill your ass.'"  Westfield was in the street and "hollered" to defendant: "'... I ain't going to fight you because you're too damn big. I'll shoot your ass.'"  Defendant appeared to run after Westfield, but Westfield left on his bicycle.

Byers testified that a few days later, she saw defendant at another neighborhood store and asked "why they was acting like a damn fool," referring to the liquor store incident. Defendant replied that Westfield said "he did not have no money and what was he doing at the [liquor] store buying stuff if he don't have no money."  Defendant added that Westfield "'just don't

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Thus, the Court adopts the factual recitations set forth by the 5th DCA.

2

know. I'll hurt him. I'll kill him'" and "'I'll kill his ass.'"  Byers told defendant, "'You all ought to quit that shit. That don't make sense.'"

Later that same day, Byers saw Westfield on a bicycle and asked him: "'[W]hy was you down there acting like a damn fool at Wayne's?'" Westfield said that defendant falsely claimed that Westfield owed him $10, and defendant tried to run him over on his bicycle. Byers told Westfield they "'got to quit that shit.'"

Westfield's statements about the liquor store incident

Westfield told several people about the liquor store incident. Westfield told his sister, Kathleen, that he got into a fight with defendant because he owed money to defendant. Westfield said defendant hit him in the face and took away his bicycle, and Westfield threw beverage cans at defendant and retrieved the bicycle. Westfield said he was riding away from the store when defendant drove up in a car and tried to run him over. Westfield said he jumped off the bicycle before defendant hit him with the car. Westfield told Kathleen that he did not think the fight was a big deal until defendant tried to run him over. Westfield thought the incident was "'just a street thing'" but that defendant was "'crazy. He's really trying to kill me.'"

Westfield also told Destiny Westfield (Destiny), Kathleen's daughter, about the liquor store incident, and said defendant was "'really tripping over a dime sack.'" According to Destiny, Westfield said he previously bought marijuana from defendant, defendant loaned him the money, and Westfield was supposed to pay $10 to defendant. Westfield said defendant talked to him about the debt and then defendant "socked" him. Westfield said he wasn't trying to fight defendant because defendant was much bigger, and Westfield left the store on the bicycle.

Westfield told Destiny that as he rode away from the store on his bicycle, defendant was driving a silver Expedition SUV and tried to hit him, and Westfield jumped off the bicycle just in time. Westfield said he was used to "'all the street stuff'" but defendant was "'really trying to kill me,'" and he couldn't believe defendant was acting that way over $10.

Destiny testified Westfield had been using her brother's bicycle that day. Westfield brought the bicycle back to Kathleen's house after defendant tried to run him over, and Destiny testified it was "kind of scraped up" and the chain was messed up.

Westfield also told his girlfriend, Ebony Washington, about the liquor store incident. According to Washington, Westfield said defendant asked for $10 that Westfield owed him for marijuana. Defendant told Westfield to "'[s]top playing with me and my money.'"  Defendant hit Westfield in the mouth, and Westfield threw beverage cans at him. Westfield said he picked up his bicycle and threw it at defendant's stomach, and defendant chased him around a car. Westfield said that as he bicycled away from the store, defendant was tried to run over him in a silver Expedition. Washington testified she saw the bicycle that Westfield used that day, and both tires were bent and it could not be ridden.

Washington later admitted that a few hours after Westfield's encounter with defendant at the

3

liquor store, she accompanied Westfield as he went back to the store. However, Washington denied that they were looking for defendant.

The hours before the homicide

Around 8:00 p.m. on November 21, 2007, Thanksgiving eve, Westfield and Washington were at the house on Strother Street. They watched television with several friends, including Varsha McClain. Westfield had arrived on a bicycle.

Around 1:20 a.m. on November 22, 2007, Thanksgiving Day, Westfield left the Strother Street house while the other people were still there. Varsha McClain decided to leave with Westfield. McClain walked along with Westfield and they split up when they reached West Eden Avenue. Westfield told McClain that he was going to Kathleen's house to get some money, and he would see her back at the Strother Street residence. McClain watched Westfield ride his bicycle into Kathleen's driveway. McClain lost sight of him, and she went in the opposite direction to a friend's house.

Discovery of Westfield's body

Deasha Eddings lived on West Eden Avenue, down the street from Kathleen's house. Eddings did not know Westfield. Around 10:30 p.m. on November 21, 2007, Thanksgiving eve, Eddings left her house and locked the front door.

Valerie Kimbro lived across the street from Eddings. Kimbro heard a single gunshot in the early morning hours of November 22, 2007, Thanksgiving Day, but she did not look outside because she always heard gunshots in the neighborhood.

Around 1:45 a.m. on November 22, 2007, Thanksgiving Day, Eddings returned to her house and noticed the front security and exterior doors were cracked open. Eddings entered her residence and found a pair of pants and shoes on the floor near the bathroom and discovered Westfield's dead body on the kitchen floor. Westfield's body was smeared with blood, and he was wearing only a shirt and boxer shorts.

The investigation

At 1:47 a.m. on November 22, 2007, officers from the Fresno Police Department responded to Eddings's house and found Westfield's body on the kitchen floor. Westfield was wearing two shirts, underwear, and a cloth rag on his head. A pair of jeans and tennis shoes were in the hallway, a knit cap was on the floor by the front door, and a bloody towel was in the living room.

Eddings's front "picture window," adjacent to the front door, was broken, and glass debris was on the front porch. There was blood on Eddings's front doors and door mat, the front porch, the broken window, the window ledge, and the interior curtains. The blood led through the living room and to Westfield's body in the kitchen. Nothing else had been disturbed in Eddings's house.

4

A small sledge hammer and a man's black jacket were on the front porch near the broken window, and blood was on both items. There were no fingerprints on the sledge hammer. The officers did not find a gun or any weapon inside Eddings's house, on Westfield's body, or in the streets around the house.

Later on the morning of November 22, 2007, as the police investigated the scene at Eddings's house, there were rumors in the neighborhood that Westfield's body was inside.  Ebony Washington was at a neighborhood store and saw defendant.  Washington was very upset and defendant asked her what was wrong. Washington replied, "'You haven't heard what happened?'"  Washington did not explain why she was upset.

As officers investigated the homicide, Kathleen informed them about Westfield's recent encounter with defendant at the liquor store. Kathleen showed the officers a bicycle at her house, which belonged to her son, and said Westfield was riding that bicycle when defendant tried to run over him. Kathleen said Westfield left the bicycle at her house after the incident. The officers did not notice any obvious damage to the bicycle to indicate it was hit by a car.

Ebony Washington testified that she had seen Westfield with a revolver several months prior to his death. The barrel was "ashy black brown" and the bottom was white; it was not silver. Westfield told Washington that he later sold the gun because he did not want to get in trouble for possession of a weapon.

Varsha McClain told officers that she had seen defendant with a gun on two different occasions. McClain said one incident occurred about a month and a half before the homicide. Defendant was in a small black car and offered her a ride. She saw a black handgun, possibly a .45-caliber weapon, on defendant's lap.

The autopsy

Westfield died from a single gunshot wound in his front right chest, which perforated the right lung and caused extensive internal bleeding. There was a tear in the front right chest of the jacket found on Eddings's porch, which corresponded to holes in the two shirts he was wearing, and the gunshot wound to his right chest. The bullet hit a rib, went through his right lung, hit another rib, and lodged into the soft tissue of his back.

The pathologist believed the gunman was standing directly in front of Westfield, because the bullet traveled into his body in a straight line, on a slightly downward angle. There was no gunshot residue around the bullet wound or on Westfield's clothing. There were abrasions and blood on Westfield's knees, thighs, and calves which appeared recent. There were healing abrasions on his elbows, which could have been from injuries about a week earlier.

The pathologist testified that Westfield did not die instantly, and he would have survived and been able to function for more than five minutes but less than 15 minutes after being shot. Westfield's cognitive functions and ability to think would have been compromised as the internal bleeding continued and reduced the blood flow to the brain. As a result, he could have

5

displayed unusual behavior before he went into shock and died.

Both of Westfield's hands had particles consistent with gunshot residue. The particles could have been on his hands if Westfield discharged or handled a gun, or raised his hands while being in close proximity to a gun (within 15 feet) as it was discharged. The residue also could have been on Westfield's hands if he passed a gun from hand to hand, or held a gun in one hand and inadvertently transferred the residue to the other hand.

Defendant's statement to the police

On November 23, 2007, defendant was interviewed by Detectives Serrano and Byrd at the police department for one hour and 40 minutes. Defendant was advised of the warnings pursuant to Miranda v. Arizona (1966) 384 U.S. 436, and agreed to answer questions. The interview was tape-recorded and played for the jury.

Defendant said he had known Westfield for about three months, and people told him that Westfield was "packing." Defendant admitted that he fought with Westfield at the liquor store a few days before the homicide and said the fight occurred because Westfield owed him $10. Defendant laughed as he talked about the incident and said they threw the bicycle at each other and he punched Westfield in the face. After the fight, defendant and his cousin were driving around, they drove past the liquor store, they saw Westfield pull a shiny chrome handgun and point it in their direction, and they drove away.

For about one hour and 20 minutes of the interview, defendant repeatedly denied any knowledge or involvement in the homicide. Defendant said he did not know anything about the homicide, he did not shoot Westfield, and he was with family and friends the entire evening. Defendant said he heard about the shooting the next morning when he saw Ebony Washington at the store. Washington was crying and said Westfield did not make it home that night. Defendant was not crying or upset as he related his conversation with Washington, and he remarked: "Evidently the mother fucker didn't make it, you know what I'm saying."

Defendant told the officers that Westfield was crazy enough to use a gun on someone, but he was not afraid of Westfield because "they can't have it with them all the time.... I've been doing this too long."  Defendant rejected the officers' suggestion that he was afraid of Westfield or shot him in self-defense.

As the interview continued, Detective Serrano advised defendant that the officers knew he was either a witness or a suspect. Defendant protested that people were lying and he did not shoot Westfield.  Defendant then changed his story and said that he was at Terrance Tucker's house on West Eden on the night of the homicide, but he "couldn't see the mother fucker." Defendant said he was on the front porch, he heard a pop, and some guy fell back. Defendant saw three "youngsters" walking in the street, and they were involved in the shooting. He only heard one gunshot but he did not see a gun. The youngsters scattered, and the apparent victim ran away on West Eden. Defendant again rejected the officers' suggestion that he shot Westfield in self-defense.

6

The officers continued to advise defendant that they had information that he was present during the shooting, and again speculated that he shot Westfield in self defense. Defendant started to cry and said he wasn't looking for Westfield, but Westfield was "coming for the second time." Defendant said that after the liquor store fight, Westfield told defendant and others that defendant would be dead in two days. Washington told defendant that Westfield wanted to talk to him.

Defendant said that on Thanksgiving Eve, he went to Tucker's house on West Eden but he was not looking for Westfield. However, defendant first obtained a "little revolver" from "my folks," just in case he ran into Westfield, since Westfield had already pulled a gun on him. Defendant said he was standing in front of Tucker's house and saw Westfield on the sidewalk. Westfield was by himself and he was not on his bicycle. Defendant decided he was going to talk to Westfield. Defendant's friends at the house did not know he had a gun.

Defendant walked up to Westfield and called out, "'[W]hat's up, Joker,'" and asked if he wanted to talk. Defendant asked Westfield if he was running around telling people that he was going to shoot defendant. Defendant kept his hands to his side.

Defendant said Westfield "freak[ed] out" when he saw defendant. Defendant said Westfield reached inside his jacket with his right hand and retrieved a chrome revolver from his left side. Defendant saw "a little bit of chrome" as Westfield raised his hand, and the gun was parallel to Westfield's left shoulder.

Defendant said that when he saw Westfield's gun, he did "'[s]ome shit I didn't want to do.'" Defendant said Westfield was about to extend his arm, but he never had the chance to point or fire the gun at defendant. Defendant reached for his own gun in his left pocket, pulled the gun, and fired once toward Westfield. Westfield turned and ran away after defendant shot him. Defendant said he did not take Westfield's gun. Defendant walked home and disposed of his own weapon in a dumpster. Defendant later showed the officers the location of the dumpster, but the officers did not find the gun.

As defendant related the story of the shooting, Detective Serrano commented that "you're telling us that you shot him in self defense," and defendant agreed.

Defense evidence

Douglas Mathis, the owner of Wayne's Liquor Store, observed defendant and Westfield verbally arguing inside the store a few days before the homicide. Defendant approached Westfield and said, "'Don't you owe me something?'" Westfield ignored defendant and "shined him on." Defendant asked for his money and they exchanged curses. Westfield walked outside and defendant followed him. Westfield tossed his bicycle at defendant, and defendant tossed it back at Westfield.

Mathis testified that defendant challenged Westfield to a fight, and Westfield replied, "'I don't fight, I shoot.'" Westfield added, "'You're too big to fight.'" Westfield also said: "[W]ait here. I'm going to go get my guns and come back and shoot your ass." Westfield left on his

7

bicycle and defendant drove away in a black SUV.  Mathis testified the men never threw punches or hit each other.

Iran Hayes was the clerk at the liquor store during the encounter between defendant and Westfield. Hayes testified that defendant asked Westfield for something and Westfield said he did not have it. Defendant was mad, he questioned why Westfield was able to buy things from the store, and they argued. Westfield said he did not have the money but offered to buy defendant a drink. Hayes heard the men argue outside for 10 minutes and did not think it was a serious argument. Hayes stayed inside the store and did not watch the encounter.

Hayes testified that about 10 minutes after the argument, Westfield and Washington arrived at the store looking for defendant. Westfield was frustrated and upset and said: "'I'm going to do something bad to him. It's going to be in the news. It's going to be in the newspaper what I'm going to do to him.'"  Westfield added: "'Start watching the paper and the news.'"

Hayes testified about an incident in March 2007, when he saw Westfield at the liquor store with a revolver. Hayes described the revolver as "grayish brown" and almost bronze, but it was not chrome. Hayes thought the barrel was about 15 to 20 inches long, and when Westfield "pulled it out, it took a minute, you know what I mean?"  Hayes did not get a good look at Westfield's revolver because "I was mainly ducking" at the time he pulled it.  Hayes did not ban Westfield from the store because he had a weapon on that occasion, but he did so because of another incident when "some youngsters" attacked Westfield at the liquor store.

(LD 4, pp. 2-12).

## DISCUSSION

I.      Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other*

grounds by <u>Lindh v. Murphy</u>, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.      <u>Legal Standard of Review</u>

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003);  <u>Williams v. Taylor</u>, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005), citing <u>Williams v. Taylor</u>, 529 U.S. 326, 405-406 (2000). A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Id., quoting <u>Williams</u>, 529 U.S. at 409-410; <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002)(*per curiam*).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. <u>Wiggins v. Smith</u>, 539 U.S. 510, 511 (2003) (citing <u>Williams v. Taylor</u>, 529 U.S. at 409).  In <u>Harrington v. Richter</u>, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  <u>Richter</u>, 131 S.Ct. at 786. As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an

unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction.  Richter, 131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332, 99 S.Ct. 2781, n. 5 (1979)(Stevens, J., concurring in judgment).  The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Richter, 131 S.Ct. at 787-788. Put another way, a state court's determination that a claim lacks merit bars federal habeas relief so long as "fairminded jurists could disagree" on the state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  Cullen, 131 S.Ct. at 1398 ("This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at the same time–i.e., the record before the state court.")

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520;  Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be

debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

   The AEDPA also requires that considerable deference be given to a state court's factual findings. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

   To determine whether habeas relief is available under § 2254(d),  the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

   The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S.

648, 659 (1984).

**III.  Review of Petitioner's Claims.**

The instant petition itself alleges the following as grounds for relief: (1) Petitioner's due process rights were violated by the state trial court's admission of evidence of Petitioner's prior convictions and reputation evidence; (2) by excluding relevant victim reputation evidence, the state trial court violated Petitioner's fifth, sixth, and fourteenth amendment rights.

A.  The 5th DCA's Opinion.
The 5th DCA disposed of Petitioner's claim in the following way:
I. Admissibility of the reason for the debt and defendant's prior convictions

Defendant contends the court should have granted his pretrial motion to exclude evidence that Westfield's debt was from a drug purchase, that defendant was a drug dealer, and that defendant had four prior convictions for possession of narcotics for sale. Defendant argues such evidence was inflammatory, prejudicial, and speculative as to motive, because his prior convictions were not violent or assaultive, and there was no evidence he routinely engaged in violent conduct involving drug debts. Defendant further argues the admission of such evidence violated his due process rights.

A. Background

During the pretrial motions, defense counsel acknowledged that evidence about the fight at Wayne's Liquor Store, and that the dispute was about a $10 debt, was admissible as to motive. However, counsel moved to exclude any evidence that the debt was the result of a drug sale and argued such evidence would inflame the jury and lead to the belief the homicide was a drug-related killing, as opposed to being triggered by issues of personal disrespect between the men.

The court found the underlying facts and circumstances about the dispute between the men were relevant to establish motive, Westfield's disrespect of defendant, and defendant's anger at him. The court noted the incident at the liquor store led to defendant allegedly trying to run over Westfield on his bicycle. Defendant later arrived in the neighborhood armed with a handgun and the dispute escalated into the homicide. The court stated the evidence about the drug debt was "not that damaging" because defendant did not have a history of violence.

The prosecutor requested to introduce evidence of defendant's four prior convictions for possession for sale of controlled substances, and that he had the reputation for selling marijuana in the neighborhood. Defense counsel objected and argued that evidence of defendant's drug activities was already being placed before the jury based on the nature of the debt.

The court held the prosecutor could introduce evidence of the existence of four prior narcotics convictions, and found such evidence was "not very prejudicial and the People do have a high burden here. I don't see a less prejudicial way of approaching it. I think as far as the probative value, it has some probative value and very little prejudice in my opinion. I'm going to allow it." The court excluded any evidence about the underlying facts of the four prior convictions. Defense counsel asked for clarification as to whether the witnesses could testify that defendant was a known drug dealer. The court replied: "He has a reputation for selling marijuana and he's the person that people-one of the people at least the people go to to buy marijuana in the

neighborhood."

B. Analysis.

"Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition...." (People v. Kipp (1998) 18 Cal.4th 349, 369; Evid.Code10, § 1101, subd. (a).) However, "this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition," such as motive, intent, identity, or common scheme and plan. (People v. Ewoldt (1994) 7 Cal.4th 380, 393, fn. omitted; People v. Balcom (1994) 7 Cal.4th 414, 422; § 1101, subd. (b).)

Motive, or lack of motive, is always relevant in a criminal prosecution. (People v. Perez (1974) 42 Cal.App.3d 760, 767; People v. Morales (1979) 88 Cal.App.3d 259, 263-265.) "Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (People v. Hillhouse (2002) 27 Cal.4th 469, 504.) "Motive is an intermediate fact which may be probative of such ultimate issues as intent [citation], identity [citation], or commission of the criminal act itself [citation]." (People v. Scheer (1998) 68 Cal.App.4th 1009, 1017-1018.)

Even if evidence of prior bad acts is relevant on the issue of motive, however, the court must determine the probative value of the evidence under section 352. (People v. Lewis (2001) 25 Cal.4th 610, 637; People v. Scheer, supra, 68 Cal.App.4th 1009, 1018.) The probative value of prior acts evidence must be "substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury. [Citation.]" (People v. Kipp, supra, 18 Cal.4th at p. 371.) "Our review on this issue is deferential. A trial court's decision whether to exclude evidence pursuant to ... section 352 is reviewed for abuse of discretion. [Citation.]" (People v. Mendoza (2007) 42 Cal.4th 686, 699.)

The trial court properly admitted evidence that the dispute between defendant and Westfield was based on Westfield's refusal to repay a $10 debt for the purchase of marijuana from defendant. Such evidence was relevant and probative to establish the motive for the dispute between the men, and that it involved a relatively small amount of money and drugs compared to their heated exchanges of threats. Defendant complains the reason for the debt was highly prejudicial. However, "[t]he 'prejudice' referred to in ... section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.'" (People v. Yu (1983) 143 Cal.App.3d 358, 377; People v. Bolin (1998) 18 Cal.4th 297, 320.) While the fact that defendant sold marijuana to Westfield may appear prejudicial, any prejudice was outweighed by the probative value of the reasons why defendant repeatedly demanded his money, Westfield's refusal to pay him, and the manner in which the dispute escalated into a homicide.

Defendant also contends the court erroneously admitted evidence of his four prior convictions for possession of narcotics for sale, and argues such evidence was irrelevant to the dispute with Westfield and highly prejudicial. The probative value of evidence of a prior offense is increased by the relative similarity between the charged and prior offenses, and the prejudicial impact of the evidence is reduced if the prior offense resulted in a conviction. (People v. Balcom, supra, 7 Cal.4th 414, 427.) This ensures that the jury would not be tempted to convict the defendant simply to punish him for the other offense and that the jury's attention would not be diverted by having to make a separate determination whether defendant committed the other offense. (Ibid.)

13

We have already found the court properly admitted evidence that defendant sold marijuana to Westfield. The court's admission of defendant's prior convictions was not prejudicial since it was merely cumulative of identical evidence already properly admitted-that defendant sold drugs. In addition, such evidence was limited to the existence of the prior convictions, and the court excluded any references to the underlying facts of those convictions.

Even if the trial court erroneously admitted evidence of defendant's prior convictions, any error is necessarily harmless. "[T]he erroneous admission of prior misconduct evidence does not compel reversal unless a result more favorable to the defendant would have been reasonably probable if such evidence were excluded. [Citations.]" (People v. Scheer, supra, 68 Cal.App.4th 1009, 1018-1019.)

As explained ante, the trial court properly admitted evidence that defendant sold marijuana to Westfield, such that the jury already knew that defendant sold drugs. There was no evidence that defendant engaged in violent or retributive conduct in connection with his narcotics activities. More importantly, however, the evidence against defendant was compelling. Defendant admitted that he pulled his gun and shot Westfield. The disputed question was defendant's intent to kill, and whether defendant shot Westfield in self-defense. Defendant insisted that he saw Westfield reach into his jacket and pull a chrome-colored gun, and he reached for his own gun when he saw the flash of chrome. As we will discuss post, the court admitted evidence that Westfield had previously been seen with firearms. However, there was no evidence that Westfield was armed that particular night. Defendant insisted he saw Westfield reach for a weapon, but he never claimed that he removed the weapon from Westfield's possession or saw Westfield drop it as he ran away. A weapon was not found where Westfield was shot on West Eden, inside or outside Eddings's house, or on Westfield's body. In contrast, defendant specifically threatened to kill Westfield after the fight at the liquor store, when defendant said that he would "'kill [Westfield's] ass'" and that Westfield did not know that defendant would "'hurt him. I'll kill him.'"

Defendant further contends the admission of evidence that he sold marijuana and his prior convictions for possession for sale violated his federal due process rights because such evidence did not support a reasonable or permissible inference on an issue related to his guilt of the charged offenses. (See, e.g., Michelson v. United States (1948) 335 U.S. 469; McKinney v. Rees (9th Cir.1993) 993 F.2d 1378, 1384.) This argument is without merit. As explained by the California Supreme Court, a defendant's federal due process rights are not implicated when the disputed evidence is relevant, material, and admissible on the grounds provided for in section 1101, subdivision (b). (People v. Catlin (2001) 26 Cal.4th 81, 123.)

(LD 4, pp. 12-17).

       B.  Federal Standard.

A federal habeas corpus court has no authority to review a state's application of its own laws, but rather must determine whether a prisoner's constitutional or other federal rights have been violated. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990). Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding.  Estelle, 502 U.S. at 67; Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.),

*cert. denied,* 478 U.S. 1021 (1985).  Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 502 U.S. at 72; Pulley v. Harris, 465 U.S. 37, 41 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied,* 510 U.S. 1191 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation.  Id. at 920.  Intent is a permissible inference that the jury may draw from the evidence of prior bad acts.  See, Houston v. Roe, 177 F.3d 901, 910 n. 6 (9th Cir. 1999).

Under California law, uncharged misconduct is admissible if the conduct is sufficiently similar to the charged offense to support the inference that the defendant probably harbored the same intent in each instance.  People v. Ewoldt, 867 P.2d 757, 7 Cal.4th 380, 402 (1994).  However, the failure to comply with state rules of evidence alone, even if established, is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation.  Id. at 920.  Intent is a permissible inference that the jury may draw from the evidence of prior bad acts.  See Houston v. Roe, 177 F.3d 901, 910 n. 6 (9th Cir. 1999).

C.  Analysis.

Initially, the Court notes that the United States Supreme Court has expressly left open the question of whether the admission of propensity evidence violates due process.  See  Estelle v. McGuire, 502 U.S. at 75, n. 5; see Holgerson v. Knowles, 309 F.3d 1200, 1202 (9th Cir.2002) (habeas relief not warranted unless due process violation clearly established by the Supreme Court); Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001), *reversed on other grounds,* Woodford v. Garceau, 538 U.S. 202 (2003)(the Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith....").  In this regard,

15

in <u>Holley v. Yarborough</u>, 568 F.3d 1091 (9th cir. 2009), the Ninth Circuit explained as follows:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ [of habeas corpus] should be issued when constitutional errors have rendered the trial fundamentally unfair [Citations], it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

<u>Holley</u>, 568 F.3d at 1101.

Hence, the state courts' rejection of Petitioner's claim *could not* have been "contrary to, or an unreasonable application of, clearly established"  United States Supreme Court authority, since no such "clearly established" Supreme Court authority exists.  28 U.S.C. §  2254(d)(1).

Second, even if the foregoing were not true, Petitioner's claim sounds only in state law and is therefore not cognizable in federal habeas proceedings.  A federal habeas corpus court has no authority to review a state's application of its own laws, but rather must determine whether a prisoner's constitutional or other federal rights have been violated.  <u>Estelle</u>, 502 U.S. at 67-68; <u>Jackson v. Ylst</u>, 921 F.2d at 885.  Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding.  <u>Estelle</u>, 502 U.S. at 67; <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985).  Petitioner has failed to show that no permissible inferences existed that the jury might draw from the challenged evidence because, as the state court noted, the evidence was clearly admissible to show both intent and motive for the murder, i.e., the victim's refusal to repay a $10 drug debt that grew from a heated dispute to a shooting. <u>Jammal</u>, 926 F.2d at 920.  Accordingly, Petitioner's claim does not rise to the level of a federal claim and is, therefore, simply an issue of state law.

Finally, even if it did, the state court's adjudication was not objectively unreasonable. The Ninth Circuit has upheld the admission of prior crimes or bad acts where (1) there is sufficient proof that defendant committed the prior act; (2) the prior act is not too remote in time, (3) the prior act is similar (if admitted to show intent); (4) the prior act is used to prove a material element; and (5) the probative value is not substantially outweighed by prejudice.  <u>See Walters v. Maas</u>, 45 F.3d at 1357-58 (upholding state admission of prior on federal habeas review); <u>see</u>, <u>also</u>, <u>United States v. Sneezer</u>, 983 F.2d 920, 924 (9th Cir. 1992), *cert. denied*, 114 S.Ct. 113 (1993).

16

All of the above factors are present in this case.  First, the evidence of Petitioner's prior drug convictions and his dispute with the victim over a drug debt were uncontroverted.  Second, there is no suggestion nor has anyone argued that the prior convictions were too remote to be relevant to intent or motive.  Third, as the state court found, the prior narcotics convictions for possession with intent to sell are quite similar in their salient characteristics to the evidence that Petitioner had sold marijuana to the victim and that the unpaid debt that resulted was the motive for Petitioner's conduct in murdering the victim.  Fourth, the prior convictions were admitted to establish intent and motive, both legitimate issues at trial.  Finally, considering all the circumstances, the Court agrees with the state court that the probative value of the prior incident outweighed its prejudicial effect.  These factors together adequately support the state court's balancing process under California's § 352.

Moreover, the trial court instructed the jury that Petitioner's uncharged acts, i.e., possessing drugs for sale and his previous altercations with the victim, were admitted for the limited purposes of showing intent and motive and for credibility purposes and should not be considered for any other purpose such as guilt.  (Clerk's Transcript on Appeal ("CT") vol. 1, 288-291.)

Thus, the Court finds the state court's admission of the evidence of Petitioner's prior convictions and history of drug selling did not render Petitioner's trial arbitrary or fundamentally unfair in violation of due process.  See Walters v. Maas, 45 F.3d at 1357-58.   As such, the state court's decision is neither contrary to or an unreasonable application of federal law and Petitioner is not entitled to relief on this claim.

II.  Exclusion Of Victim Reputation Evidence.

Petitioner next contends that his constitutional rights were violated when the state trial court refused to admit evidence of the victim's reputation for violence, that a few months prior to the crime he had engaged in an unrelated shoot-out at the same liquor store, and that Petitioner regularly carried a firearm.  This contention is also without merit.

A.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

A. Background

17

Defense counsel sought to introduce evidence that Westfield carried a handgun based on an incident when he was involved in a shoot-out with some juveniles at Wayne's Liquor Store in March 2007. Defendant was not involved in that incident, and it was unrelated to Westfield's dispute with defendant or his subsequent fight with defendant at the same store. Counsel argued such evidence was relevant because defendant knew about the incident and that Westfield carried a handgun. Counsel requested the court to conduct a section 402 hearing as to the prospective testimony of the witnesses to the liquor store shoot-out.

The prosecutor argued the evidence about the shoot-out was irrelevant, confusing, and prejudicial because it was unrelated to defendant's dispute with Westfield. There were conflicting reports about who started the shoot-out at the liquor store, and the court would have to conduct a mini-trial as to the exact facts of the shootout. The prosecutor noted the police report stated that Iran Hayes, the liquor store clerk, was unable to identify the man who was involved in the incident with the juveniles, he did not know who fired first, there were different caliber weapons involved, and there were bullet holes all over the place. The prosecutor further noted the shooting witnesses repeatedly changed their stories about the incident, and the investigating officers would have to be called to impeach their testimony.

Defense counsel acknowledged the shooting witnesses offered conflicting evidence as to who started the shooting, but argued the evidence was relevant regardless of the instigator's identity because it established that Westfield "in this particular case was packing, I think that part of it is undisputed." Counsel particularly wanted to introduce Hayes's description of Westfield's gun as being "the largest barreled gun that I've ever seen."

The court held that Hayes's description of Westfield's gun was admissible, but excluded any evidence about the shoot-out between Westfield and the juveniles because there was insufficient evidence as to whether Westfield was the aggressor or defending himself.

Defense counsel also sought to introduce evidence that Westfield was involved in fights and altercations unrelated to his dispute with defendant and argued the evidence was relevant to show that Westfield often fought with people and defendant feared him. The prosecutor objected because the fights were unrelated to defendant, and defendant made statements that he was not afraid of Westfield. The court found the prior incidents were not relevant because no weapons were involved.

Defense counsel moved to introduce evidence about another shooting incident, which occurred when Westfield and Washington were at the Strother Street house, someone shot at the house, Westfield retrieved a weapon from the house, and he went outside and fired back. Defendant was not involved in this incident and it was unrelated to Westfield's dispute with defendant. The prosecutor argued the incident was not relevant because there was no evidence that defendant knew about the shooting. The court excluded the evidence because Westfield was not the aggressor.

Defense counsel also wanted to introduce evidence that Westfield was previously shot in the foot. Counsel stated that Westfield initially claimed someone else shot him, the investigating officer determined Westfield shot himself, and counsel argued the evidence was relevant to show Westfield was in possession of a weapon. The court excluded the evidence because it was "pure speculation" as to whether Westfield had a gun or someone else shot him.

B. Analysis.

Defendant contends the court should have admitted evidence about these various incidents to show that Westfield regularly carried and used firearms, and he had a reputation for violence. As explained ante, evidence of a person's character is generally inadmissible to prove that

person acted in conformity with his or her character, or trait of character, on a given occasion. (§ 1101, subd. (a).) Section 1103, subdivision (a)(1) states an exception to this general rule and allows a criminal defendant to present evidence of the victim's character to show the victim acted in conformity with his or her character, or trait of character, at the time of the charged crime. (<u>People v. Shoemaker</u> (1982) 135 Cal.App.3d 442, 446-447.) "[I]n a prosecution for ... an assaultive crime where self-defense is raised, evidence of the violent character of the victim is admissible to show that the victim was the aggressor. [Citations.]" (<u>Id</u>. at pp. 446-447, fn. omitted.)

Under section 1103, the victim's character traits "can be shown by evidence of specific acts of the victim on third persons as well as by general reputation evidence. [Citation.]" (<u>People v. Wright</u> (1985) 39 Cal.3d 576, 587.) Evidence that the victim had a reputation for violence or aggressiveness, and acted in conformity with that reputation at the time of the alleged crime, may be shown by acts of violence or aggression on the part of the victim before or after the time of the alleged crime. (<u>People v. Shoemaker, supra</u>, 135 Cal.App.3d at p. 447.) However, evidence offered in support of a defendant's claim of self-defense is subject to exclusion under section 352. (<u>In re Christian S.</u> (1994) 7 Cal.4th 768, 783; <u>People v. Wright, supra</u>, 39 Cal.3d at p. 587.)

The trial court properly excluded the evidence about Westfield's purported participation in the liquor store shoot-out because it was completely unrelated to defendant's dispute with Westfield. Moreover, as the prosecutor noted, such evidence would have required the court to conduct a " 'mini-trial' " because of significant inconsistencies between witnesses as to exactly what happened during that incident and would have created the possibility of confusing the issues or misleading the jury. (See, e.g., <u>People v. Hamilton</u> (2009) 45 Cal.4th 863, 930; <u>People v. Geier</u> (2007) 41 Cal.4th 555, 582.) Section 352 "empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (<u>People v. Wheeler</u> (1992) 4 Cal.4th 284, 296; <u>People v. Ayala</u> (2000) 23 Cal.4th 225, 301.) Defendant's proffered evidence about the liquor store shoot-out was both inflammatory and time-consuming, and the court properly excluded it under section 352.

Defendant complains the court should have admitted evidence of incidents where Westfield challenged various people to fight, or when he was observed in possession of a firearm. Defendant asserts the court's exclusion of these incidents prevented the jury from hearing evidence that Westfield carried a gun and had a reputation for violence. Even if such evidence was erroneously excluded, however, the court admitted numerous other examples of Westfield's reputation for making violent threats directly to defendant. In his statement to the police, defendant said that Westfield told him that defendant would be dead in two days. Defendant's statement was corroborated by Carol Byers, who watched the encounter between defendant and Westfield at the liquor store. Byers testified that Westfield "hollered" that he was not going to fight defendant because he was too big, but he would "'shoot [defendant's] ass.'" Douglas Mathis, the owner of the liquor store, testified that defendant challenged Westfield to fight, but Westfield replied: "'I don't fight, I shoot.'" Westfield added, "'You're too big to fight.'" Westfield also said: "'[W]ait here. I'm going to go get my guns and come back and shoot your ass.'"

Iran Hayes, the store clerk, testified about 10 minutes after defendant and Westfield argued, Westfield and Ebony Washington arrived at the store looking for defendant. Westfield was frustrated and upset and said: "'I'm going to do something bad to him. It's going to be in the news. It's going to be in the newspaper what I'm going to do to him.'" Westfield added: "'Start watching the paper and the news.'"

There was also evidence that corroborated defendant's claim to the police that he heard Westfield was "packing." Westfield's girlfriend testified she had seen Westfield with a

19

revolver several months before the homicide, but she claimed that Westfield sold the weapon because he did not want to get in trouble for having a weapon.  Hayes testified that in March 2007, he saw Westfield at the liquor store with a revolver, the barrel was about 15 to 20 inches long, and when Westfield "pulled it out, it took a minute, you know what I mean?"  Hayes did not get a good look at Westfield's revolver because "I was mainly ducking" at the time he pulled it.  Hayes did not ban Westfield from the store because he had a weapon on that occasion, but he did so because of another incident when "some youngsters" attacked Westfield at the liquor store.

There was thus ample evidence before the jury that Westfield carried and used a firearm, and that he made numerous threats against defendant as a direct result of the fight at the liquor store. The jury was well aware of Westfield's behavioral history relevant to the defense theory of the case.

(LD 4, pp. 17-22).

B.  <u>Federal Standard</u>.

The rights encompassed by the Sixth Amendment include the rights to cross examination, <u>Davis v. Alaska</u>, 415 U.S. 308, 315-316 (1974), and to present relevant evidence, <u>Michigan v. Lucas</u>, 500 U.S. 145 (1991).   A defendant has no right, however, to present irrelevant evidence.  <u>United States v. Torres</u>, 937 F.2d 1469, 1473 (9th Cir. 1992).  It is within the trial court's discretion to determine which issues are relevant.  <u>See id.</u>

Even relevant evidence can be excluded in certain circumstances.  <u>Wood v. Alaska</u>, 957 F.2d 1544, 1549 (9th Cir. 1992).  The Ninth Circuit has indicated that the appropriate Sixth Amendment analysis involves a two-part inquiry:

"We inquire, first as to whether the excluded evidence is relevant.  If it is not relevant, [a petitioner] had no constitutional right to present it.  If the evidence is relevant, we ask next whether other legitimate interests outweighed [the petitioner's] interest in presenting the evidence.  Because trial judges have broad discretion both to determine relevance and to determine whether prejudicial effect or other concerns outweigh the probative value of the evidence, we will find a Sixth Amendment violation only if we conclude that the trial court abused its discretion."

<u>Wood</u>, 957 F.2d at 1550, quoting <u>United States v. Feldman</u>, 788 F.2d 544, 554 (9th Cir. 1986).

The right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."  <u>Chambers v. Mississippi</u>, 410 U.S. 284, 295 (1973). The Supreme Court has recognized that a state has a legitimate interest in protecting rape victims against unwarranted invasions of privacy and harassment regarding their sexual conduct.  <u>Lucas</u>, 500 U.S. at 152-153.  Additionally, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on...cross-examination based on concerns about, among other

things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986).

In <u>Lucas</u>, the Supreme Court reversed the Michigan Court of Appeals' per se rule that the notice requirement in Michigan's rape shield law violated the Sixth Amendment in all cases where it was used to preclude evidence of past sexual conduct between a rape victim and a criminal defendant. <u>Lucas</u>, 500 U.S. at 146.  The Court recognized that the Sixth Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."  <u>Id.</u> at 149.  However, the restrictions on the defendant's right to present testimony "may not be arbitrary or disproportionate to the purposes they are designed to serve."  <u>Id.</u> at 151.

Since <u>Lucas</u>, the Supreme Court has indicated that the preclusion of evidence under state evidentiary rules will generally not violate the Constitution.  In <u>United States v. Scheffer</u>, 523 U.S. 303, 308 (1998), the Court recognized that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials..." and that "[s]uch rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"  <u>Scheffer</u>, 523 U.S. at 608 (internal citations omitted). The exclusion of evidence is unconstitutionally arbitrary or disproportionate "only where it has infringed upon a weighty interest of the accused."  <u>Id.</u>

C.  <u>Analysis</u>.

Regarding the trial court's exclusion of the prior altercation involving the victim at the liquor store, the 5th DCA concluded that the incident

> "was completely unrelated to defendant's dispute with Westfield.  Moreover, as the prosecutor noted, such evidence would have required the court to conduct a 'mini-trial' because of significant inconsistencies between witnesses as to exactly what happened during that incident and would have created the possibility of confusing the issues or misleading the jury."

Regarding the exclusion of evidence that the victim was violent, the state court noted that ample evidence had been presented regarding the victim's threats to Petitioner to support a defense theory that the victim was the aggressor and that Petitioner acted in self-defense.  Finally, the exclusion of certain evidence that the victim regularly carried a weapon was countered with the admission of other

21

evidence by both the victim's girlfriend and the liquor store employee that they had seen the victim carrying a gun.  The jury was then instructed that if it found that Petitioner had been threatened by the victim in the past or that Petitioner was aware that the victim had "threatened or harmed" others in the past, the jurors could consider that evidence in determining whether Petitioner's claim of self-defense, if believed, was reasonable.  (CT vol. 1, 294-299).

Petitioner has thus failed to show that the exclusion of this evidence was a violation of state law, much less a federal constitutional violation.  However, even if such a contention could legitimately be made, because of the admission of other evidence regarding the victim's propensity for violence and his reputation for using and carrying a gun, any error in excluding the disputed evidence was harmless, i.e., it did not have a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714 (1993)(*quoting* Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)).  In order for an error to have a "substantial and injurious effect or influence," it must have "affected the verdict."  Given the discussion above, it is clear that the exclusion of this evidence could not have "affected the verdict."  Accordingly, the state court adjudication was objectively reasonable.

## **RECOMMENDATION**

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within twenty-one (21) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

22

may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

    Dated:  __**January 9, 2014**__            _____**/s/ Jennifer L. Thurston**
                                              UNITED STATES MAGISTRATE JUDGE